COBB v. RILEY. (No. 8452.)

(Court of Civil Appeals of Texas. Ft. Worth. Oct. 28, 1916.)

1. WITNESSES ☞255(5)—REFRESHING MEMORY—STATEMENT FROM BOOKS OF ACCOUNT.

One who loaded cars with goods sold and shipped, and made out slips of the amount in each car, and turned them in to the bookkeeper, can refresh his memory from a statement thereof drawn from the books, and testify to its correctness; that is, that it is a correct copy of the memoranda originally made by him.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 878; Dec. Dig. ☞255(5).]

2. SALES ☞181(13) — ACTION FOR PRICE — REJECTION OF GOODS—EVIDENCE.

Evidence, in an action for price of gravel sold and shipped, held sufficient to sustain a finding of none of it having been rejected as unfit.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 491; Dec. Dig. ☞181(13).]

3. SALES ☞181(11) — ACTION FOR PRICE — RECEIPT OF GOODS—EVIDENCE.

Evidence, in an action for the price of gravel sold and shipped, held sufficient to sustain a finding of defendant having received it; except as to a car billed, without authority shown, to a town, instead of to defendant.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 486, 487, 490; Dec. Dig. ☞181(11).]

Appeal from Denton County Court; Fred M. Bottorff, Judge.

Action by J. H. Riley against O. E. Cobb. Judgment for plaintiff, and defendant appeals. Affirmed, on condition of remittitur.

R. H. Hopkins, of Denton, for appellant. Owsley & Owsley, of Denton, for appellee.

BUCK, J. ·J. H. Riley, a resident of Dallas county, sued O. E. Cobb, a resident of Denton county, in the county court of Denton county, and for cause of action pleaded that plaintiff was operating a gravel pit near Carrollton, Dallas county, and that defendant was a contractor engaged in the business of constructing streets, etc.; that during the year 1913, defendant purchased from the plaintiff some 37 cars of gravel, agreeing to pay therefor 90 cents per yard, less the freight charges from Carrollton to Pilot Point; that defendant agreed to advance the freight charges on the receipt of the gravel at Pilot Point, but the amount of said charges was agreed to be deducted from the total amount due at the agreed price per yard. Attached to plaintiff's petition were Exhibit A, showing the number of cars shipped, the dates of shipment, and the number of yards contained in each car, and the value of the gravel in each car at the agreed price, totaling $1,164.60; Exhibit B, giving the list of the freight charges paid by defendant on each car, said amount being $623.37. Plaintiff acknowledged the receipt of $143, and sued for the balance alleged to be due, to wit, $398.23. Defendant in his answer alleged that he had paid, in addition to the $143, evidenced by a check, the sum of $7 in money. He further pleaded that under the contract between him and Riley, Riley was to furnish him, f. o. b. cars at Pilot Point, with gravel of the stipulated and agreed grade at 90 cents per yard; that under the terms of said contract it was agreed that if any of the said gravel failed to meet the approval of the engineer, Rush, employed by the town of Pilot Point, said gravel was to become the property of the plaintiff; that thereafter the plaintiff shipped to the defendant some 15 cars of said gravel, which were condemned by engineer Rush and held to be unfit to be used upon the work defendant was doing in the town of Pilot Point; that each of said cars contained approximately 28 yards of gravel. That after the condemnation of said 15 cars of gravel, plaintiff came to Pilot Point and ascertained the number of yards of gravel so condemned. Defendant further pleaded that he had paid,

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

as freight charges on said 15 cars, alleged to have been condemned, the sum of from $16 to $20 per car, and that it had cost him about $3 per car to unload said cars of gravel so condemned, and that plaintiff became liable to defendant for said freight charges and cost of unloading. He further pleaded that each of the cars received was short from six to eight yards in the amount alleged by plaintiff to be contained and charged for by plaintiff, and that by reason thereof plaintiff was indebted to him in the further sum of $199.80. He further pleaded that plaintiff was indebted to defendant in the sum of $560 for gravel used and shipped by plaintiff out of a gravel pit owned by defendant. Defendant sued plaintiff in reconvention for the sum of $860. Plaintiff, by supplemental petition, denied the allegations contained in defendant's answer: First, as to the amount paid plaintiff by defendant; second, as to the condemnation and unfitness of the 15 carloads of gravel; third, as to the claim of defendant for gravel alleged to have been used out of defendant's gravel pit. Upon a jury trial, the cause was submitted upon a general charge, both as to plaintiff's claim and defendant's counterclaim, and the jury returned the following verdict:

"We, the jury, find for the plaintiff, J. H. Riley, $398.23, as asked for."

Whereupon the court entered judgment for plaintiff in said amount, and further decreed that the defendant should take nothing by reason of his counterclaim. Defendant appeals.

[1] The plaintiff's witness Larkin testified that he loaded the gravel in the 37 cars shipped to Pilot Point, and made out slips showing the amount in each car and each night he would turn in to the bookkeeper these slips to be copied in a book kept by the bookkeeper; that part of the time Miss Mertie Riley was bookkeeper, and later a Mr. Painter took her place; that the witness had looked over the statement handed him by counsel for plaintiff, and that, while he did not make that statement himself, he knew from what the statement was made, and that it was made from the two books kept by the bookkeepers aforesaid; that he had refreshed his memory by looking over the statement, and to the best of his memory it was a correct statement of the amount of gravel that he had loaded. The defendant objected to the last answer of the witness—

"the objection being that the statement offered—the evidence shows that it is a copy from the book, the books having been kept by Mertie Riley and the witness Painter, who has testified—the witness Mertie Riley has not testified, and the statement that it is made from books kept by her is not admissible in evidence unless she is here to testify that the books the statement was taken from are correctly kept."

We do not think the answer of the witness to the question propounded by plaintiff's counsel, to wit:

"Since you have done that (that is, refreshed his memory by looking at the statement), can you tell whether it was a correct statement of the number of cars and the amount of gravel in each car; have you looked or can you tell whether you can do that?"

—is subject to the objection urged: First, that it was an effort to prove by the witness a fact from a copy made from books kept by another person without first proving that the books were properly kept; and, second, that the evidence was inadmissible because hearsay. The witness answered the question to the effect that the statement handed to him was a correct statement of the number of cars and the amount of gravel that he loaded for the plaintiff to ship to the defendant at Pilot Point. The witness having made the memorandum from which the purported statement shown the witness was made, after having been copied into the books kept by the bookkeepers and thence transferred to the statement tendered the witness for the purpose of refreshing his memory, would be competent to testify whether the statement so shown the witness was in fact a correct copy of the memoranda originally made by the witness. We understand this to be the effect of the testimony objected to. The statement itself was not offered in evidence at this time, but only the declaration that it was a correct statement, which was, in effect, a shorthand rendition of testimony that the statement shown the witness contained the same items, as to dates, weights, etc., as the lists furnished by him to the bookkeepers, and that the lists prepared by him were correct. In the case of Eppler v. Brown, 30 S. W. 710, cited by appellant, by this court in an opinion by Justice Head, it was held that a manuscript copy of a list of weights of certain cotton taken from a letter book impression of a letter into which such weights had been copied from the weigher's book was not admissible in evidence to show the classification of the cotton, no sufficient excuse being shown for failure to produce the weigher's book, from which they were first copied. But the opinion further states that:

"There was no claim that the witness was able to testify from memory after inspecting these papers."

Thus, in effect, this authority holds that the manuscript copy could properly be submitted to the witness for the purpose of refreshing his memory, and if, after having it so refreshed, he was able to testify that the items therein contained were correct, he would be permitted to do so. In the case of Garrett v. Garrett, 47 S. W. 76, also cited by appellant, it was attempted to prove by a witness that, after the death of deceased, the witness, the plaintiff, and the defendant examined the books of deceased, and from the best they could tell, deceased owed the plaintiff about $208. The court properly held that the books themselves were the best evidence of the facts sought to be established,

and that the statements of the witness as to the contents of the books were purely hearsay. But if it had been shown, as in this case, that the witness had furnished the data or information as to the items and charges contained in the books, and the witness had been shown a statement purporting to contain such items or charges, we doubt not that the court would have held that the witness could have refreshed his memory therefrom and testified to the correctness of such items or charges. Gresham v. Harcourt, 33 Tex. Civ. App. 196, 75 S. W. 808; T. & P. Ry. Co. v. Daugherty & Voliva, 33 Tex. Civ. App. 267, 76 S. W. 605; Smith v. James, 42 S. W. 792; Wigmore on Evidence, §§ 748, 750.

[2] We overrule appellant's first assignment, presenting this alleged error, and also his second assignment directed to the verdict of the jury as being contrary to the evidence and against the weight of the evidence as to the gravel alleged to have been rejected by reason of being unfit for use. While defendant, as well as some of his witnesses, testified to the rejection of some 12 or 15 cars of gravel, yet the plaintiff and his witness Larkin, and perhaps others, testified to facts and circumstances which put the question of whether or not any of the gravel was rejected as unfit for use squarely in issue, and the jury has passed upon this question of fact adversely to the defendant. Larkin testified, in brief, upon this question that the defendant Cobb came to the pit and selected the kind of gravel he wanted, and that witness loaded the gravel that was shipped to him, and that it was extra good and was better than the gravel defendant picked out. The plaintiff Riley testified to the same general effect, and, further, that, though he went to Pilot Point while the work was under construction, and saw the defendant, he never heard of any of the gravel being condemned, and that he was not notified to such effect, and never heard of Cobb's making any objection about the character of the gravel shipped; that he went to the railroad agent after the work was completed to check over the lists of cars and get the amount of freight, and that at that time there was no gravel in the yard; that he never heard any complaint as to the quality of the gravel until about the time the suit was filed. Defendant himself testified that in fact he did use at least a part of the gravel he claimed to have been condemned by the engineer for the purpose of making fills around some curbing at the depot, etc.

[3] Appellant's third and fourth assignments are directed to the insufficiency of the evidence to sustain the verdict and judgment as to the last three cars of gravel delivered, appellant claiming that the undisputed testimony shows that these three cars were not received by the defendant, nor used by him, but received, if at all, by the town of Pilot Point, and receipted for by its agent, one L. Shaw. It is true that the witness R. L. Boran testified:

"That last car was signed for by L. Shaw, a man who hauled for the city of Pilot Point. Car 16207, on which the freight was $21.72, was billed out on the 28th of November, and was received at Pilot Point on the 1st of December. The three last cars were hauled by Shaw. He receipted for and hauled the three last cars, and the last car to arrive was billed to the city of Pilot Point. He didn't say whether any of the gravel shipped by Riley was unloaded down there by the side of the track, but from the time the gravel first commenced to come in there until it was finished, there were several cars unloaded by the side of the track. * * * It was unloaded at the request of Mr. Cobb in order to save demurrage; the cars were coming in so fast on him that they couldn't possibly get the gravel off the cars before the time limit was up on them. The gravel that was unloaded there to prevent demurrage was hauled away. There was none of that gravel left there by the side of the track; it was all hauled away. * * * The last car that was received on December 13th was not billed to O. E. Cobb at all; it was billed to the city of Pilot Point. Yes; that car is included in the exhibit that is attached to the plaintiff's petition. I presume the city paid the freight on the car of gravel that was shipped to the city of Pilot Point. It is signed for by a man that hauled for them sometimes. Yes; that is the same man that receipted for some gravel that was shipped to Cobb."

Defendant Cobb testified:

"The freight bill that you have just handed me is for a car of gravel shipped to the city of Pilot Point. That car was shipped on the 11th of December, and arrived at Pilot Point on the 13th of December. I did not get that car of gravel; I was away from there then. That car of gravel is charged to me on the list made up by the defendant in this case. * * * The freight on that car was $19.50. That car was signed for by Mr. Shaw. As to whether I did not order and get this car billed to O. E. Cobb on which the freight was $21.72, will say that was a Cotton Belt shipment, but the city of Pilot Point took that one, too; the city of Pilot Point put two inches of gravel on the streets after I left there. Yes; it shows on this freight bill that the car was consigned to me. It shows that the car was receipted for by Shaw, but then Shaw had nothing to do with my business. I did not pay the freight on that car. I did not get that car. That car was shipped the 28th of November. It was along about the 1st of December when we got through with our job there. The freight bill shows that the car was received there and receipted for the 1st of December. I was not at Pilot Point at that time. I think it was about the 1st of December when I left there. As to how it is that it was shipped to me there, will say I was getting this gravel, and after I left there, they had so much water there on the streets that ran from the hotel down there to the depot, they had only put in six inches of gravel there, and the city put two inches more of gravel on there after I had left and finished the job."

The plaintiff Riley testified:

"There was one car of gravel shipped by me to the city of Pilot Point, and I rendered the city a statement for that car of gravel. * * * We got a letter with reference to that car, but I do not have the letter with me. Cobb, nor the city of Pilot Point, or nobody else ever paid me for that carload of gravel. Yes; we shipped the car up there."

Cobb further testified that on or about the 3d or 4th of December, he went back and

settled with the town of Pilot Point for the work done, and as to the last three cars of gravel shipped, he testified, in part, as follows:

"No; I don't know where that gravel went. I know that it was not by my own arrangement that those three carloads of gravel went in there on that job. I couldn't tell you by what authority the city of Pilot Point took those two cars of gravel that were shipped to me. It is a fact that I left my checks signed by me—to pay the freight. I left them with Smith and Degan. Yes; I suppose those checks went to pay the freight. As to whether I raised any fuss about them using my checks to pay the freight on gravel that belonged to the city of Pilot Point, will say I don't suppose I knew anything about the city's books or stuff; Degan kept those books, and I supposed he was looking after it—it was a small job and I never looked after it. I don't say that I didn't know anything about the job; I was there and knew a little about it. * * * It was about the last of November or the first of December that we loaded the equipment."

The witness Boran further testified as to blank checks being left by Cobb to pay the freight. Cobb further testified as follows:

"I said a while ago that I didn't think it made any difference about the number of cars that were condemned. The reason I said that, I just figured that it didn't make any difference. I figured that that would be the last time I would have a job that I could use gravel around here, and I knew that it would be the last chance I would ever have of getting that money. * * * As to whether it is not a fact that I was trying to get out of there the best I could and not pay him for the gravel, will say I was trying to get as much as I could on the debt."

While the evidence is not in a very satisfactory condition for us to determine the question with any degree of accuracy, we have concluded that in support of the verdict and judgment we are justified in concluding that the evidence is sufficient to sustain the verdict and judgment as to the last two cars shipped to the defendant, and the freight on which was probably paid by him with the blank checks left for that purpose. There is no evidence to which we have been directed going to show that defendant had notified the plaintiff not to ship any more gravel before the shipment of these two cars mentioned, and even though said cars were in fact used by the town of Pilot Point, or by some person other than the defendant, yet, since they were billed to defendant, and apparently the freight thereon was paid by him, we are of the opinion that the appellant cannot complain of the verdict and judgment as to the two cars mentioned, and therefore overrule appellant's fourth assignment.

But as to the third assignment, complaining of the verdict with reference to the last car, which the uncontradicted evidence shows was billed to the town of Pilot Point and the freight probably paid for by it, and said billing is not shown to have been authorized by the defendant, we are of the opinion that, so far as the last car mentioned is concerned, the verdict is without sufficient evidence to sustain it, and appellant's third assignment is hereby sustained.

As to the fifth assignment, complaining of the verdict and judgment on defendant's counterclaim for freight paid by him on the 12 to 16 cars of gravel shipped by plaintiff and claimed by defendant to have been condemned by Engineer Rush, we hold that, for the reason given in discussing the second specification of error, said assignment must be overruled.

For the error in permitting plaintiff to recover for the car of gravel billed to Pilot Point, the judgment must be reversed, unless within 15 days from this date the appellee shall file a remittitur in the sum of $14.70, being $34.20, the amount of gravel, less $19.50, amount of freight paid by the city. If said remittitur shall be filed within the time designated, the judgment will be reformed and affirmed; and if not, the judgment will be reversed and the cause remanded. Costs of appeal taxed against the appellee.